IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. ROOSEVELT CLAY, | ) ) ) | |
| Petitioner, | ) ) | No. 09 C 1066 |
| v. | ) ) ) | Wayne R. Andersen District Judge |
| DONALD GAETZ, Warden, Menard Correctional Center, | ) ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on the petition of Roosevelt Clay ("Clay") for habeas corpus relief pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition for habeas corpus [1] is denied.

## BACKGROUND

Clay was convicted in 1988 for the 1975 murders of Dr. Lawrence Gluckman and two of Dr. Gluckman's patients, Minnie and Tressie Harris. *People v. Clay*, 884 N.E.2d 214, 217 (2008). In 2004, defendant filed a post-conviction petition, alleging that newly discovered evidence disclosed that Frank Love, a key witness for the prosecution, had lied about his motive for testifying at defendant's trial. *Id*. The trial court granted Clay's post-conviction petition and ordered a new trial. *Id*. At the conclusion of the second trial, which took place in December of 2005, the jury found Clay guilty of three counts of murder, and the court sentenced him to concurrent 60 to 120 year prison terms. *Id*. at 220. Clay appealed, and the Illinois Appellate Court, First District, affirmed the judgment on February 19, 2008. On May 29, 2008, the Illinois

Supreme Court denied Clay's petition for leave to appeal (PLA). *People v. Clay*, 889 N.E.2d 1118 (2008). Clay did not file a petition for certiorari (Pet. at 3), nor has he filed any collateral attacks in state court challenging the second conviction or sentence (Pet. at 4-5). Clay filed the instant habeas petition on February 18, 2009, and is currently in the custody of Donald Gaetz, Warden of Menard Correctional Center, identified as prisoner number L40191.

I. **Factual Background**

For purposes of federal habeas review, "a determination of a factual issue made by a State court shall be presumed correct," and "the applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e). Clay does not challenge to statement of facts set forth in the order of the Illinois Appellate Court affirming his second conviction. Thus, we will adopt the facts of the Illinois Appellate Court decision as our own:

> At the second trial in 2005, the evidence established that at around 6:20 p.m. on April 25, 1975, Chicago police found the bodies of Dr. Lawrence Gluckman and two of his patients, Minnie and Tressie Harris, in Dr. Gluckman's car. . . . Dr. Gluckman's body was found in the trunk, and the women's bodies were found partially covered with green plastic garbage bags in the back seat. The rear window of the car was shattered. An autopsy indicated Dr. Gluckman sustained a blunt force trauma to the head and died of a heart attack. Minnie and Tressie Harris both died as a result of gunshot wounds to the head.
>
> The parties stipulated that Dr. Gluckman, Minnie Harris, and Tressie Harris left Dr. Gluckman's clinic at Warren and Western at around 4 p.m. on April 25. Three phone calls were made to Dr. Gluckman's wife between 6:30 and 7:20 that evening, each demanding $100,000 be paid or Dr. Gluckman would be killed.
>
> On April 27, 1975, Detective Anthony Katalinic arrested Frank Love after Delores Townsend named him in a statement. According to Detective Katalinic, Love implicated six people in the kidnapping and murders: Roosevelt Clay, David Clay, Harold Smith, Matthew Williams, Michael Wilson, and Willie Carter. When Detective Katalinic went to Annie Clay's-defendant's mother's-home, he was given permission to search the garage. He recovered glass shards from the floor and green plastic bags similar to the type found covering the victim's bodies in Dr. Gluckman's car. Detective Katalinic testified that Franklin Scott identified

defendant in a lineup as being one of the people he saw standing behind Dr. Gluckman's clinic on the afternoon of the abduction. . . .

Scott Jennings testified that, in 1983, he worked as an FBI agent in the Chicago office. On June 13, 1983, Jennings met defendant in the Cook County Jail after defendant told him he had information regarding a murder. After being advised of his *Miranda* rights, defendant signed a waiver of his rights and gave an oral statement regarding his involvement in a triple murder in 1975. Jennings testified he told defendant he could be prosecuted for the murders, and that no threats or promises were made to induce defendant to confess. . . . Jennings contacted Detective Katalinic and arranged for him to interview defendant.

Detective Katalinic testified defendant gave him details during his confession that he was not able to get from anyone else questioned, including Love and Scott. Defendant told Detective Katalinic that sometime in April 1975 he went to his brother David's house and walked in on a meeting. His brother, Willie Carter, Frank Love, Matthew Williams, and Michael Wilson were discussing a plan to kidnap Dr. Gluckman. Defendant insisted on being included in the plan. Defendant told Detective Katalinic that he brought the gun and drove to the clinic in a separate car. When Dr. Gluckman came out of the back door of the clinic with two women, defendant gave the gun to Smith. They both approached the doctor with the gun drawn. They ordered Dr. Gluckman to get into the trunk of his car. When Dr. Gluckman refused because he had a bad heart, Smith and Carter picked him up and put him in the trunk. After Williams forced the two women into the car, Williams drove the car to defendant's aunt's house.

Defendant told Detective Katalinic that when he discovered Dr. Gluckman was dead, he and Carter went into the house to talk to David Clay and Wilson. They decided to shoot the two women. . . . Carter then shot the women. Williams and defendant abandoned Dr. Gluckman's car . . . . Defendant told Detective Katalinic that everyone involved in the kidnapping, except for Love, was a Vicelord. Defendant said some Vicelords visited Love at jail after he was arrested. They threatened to kill him if he cooperated with the police. . . .

Following his arrest, [Frank] Love gave a statement implicating defendant and David Clay. While Love was at Cook County Jail awaiting trial, defendant and David Clay were transferred to the same tier. Love testified defendant and David Clay told Love to "keep his mouth shut and do the time, take the weight." Love did not testify against either defendant or David Clay in the 1970s. In 1988, however, Love testified against defendant at his first trial. Shortly after defendant was sentenced, the prosecutor appeared before the parole board to support Love's parole request. Love testified he had hoped he would be released from prison after testifying against defendant, but denied being promised anything in exchange for his testimony. . . .

>Defendant contacted [FBI Agent] Jennings [ ] after he was convicted of armed robbery. According to defendant, Jennings said he would try to get defendant out of jail because he wanted more information on [Mike] Switek [, "a leading mob figure"]. Because defendant was in State custody, Jennings told him he had to "give the State something." Defendant told Jennings he had information regarding a murder. When Jennings said he needed "eyewitness stuff," defendant lied and said he was present when the murder occurred. Jennings and another agent came to the jail to interview him. Defendant gave them information about Dr. Gluckman's kidnapping that he had learned from various sources-including the media, Love, Willie Carter, Fast Black, and Michael Wilson. Defendant testified he and Love had talked a lot about the offense while they were in jail together. Defendant said that when he gave his statement to Detective Katalinic, he included things he had heard from others and things he had made up.

## II.     Direct Appeal

Based on these facts, the trial court found Clay guilty of three murders. Clay appealed to the Appellate Court of Illinois, raising two arguments. First, he asserted that "the Court committed reversible error by allowing the state to impeach Clay with his prior murder conviction . . . ." (Answer Ex. A at i.) Second, he argued that he was denied his Sixth Amendment right to the effective assistance of counsel when his attorney:

1. Characterized him in opening statement as a "gang banger" who had committed several unrelated felonies and worked for "the Italians" involved in organized crime;

2. Failed to utilize prior testimony to impeach a key witness (Frank Love);

3. Elicited inflammatory testimony that Clay's family tried to firebomb Frank Love's house right before trial;

4. Did not move to strike prejudicial testimony that was volunteered on cross-examination; and

5. Failed to object to prosecutorial misconduct in closing argument.

*Id*. at i-ii. We note that these five issues are the same issues raised in the instant petition regarding ineffective assistance of counsel.

In response to the issue regarding Clay's prior murder conviction, the Appellate Court concluded that the trial court did not abuse its discretion in allowing the use of the prior murder conviction. *People v. Clay*, 884 N.E.2d at 222. In response to the ineffective assistance of counsel claims, the Appellate Court determined that:

1. Defense counsel's comments in opening statement were objectively unreasonable, but because of the overwhelming evidence of defendant's guilt, the comments did not prejudice Clay;

2. Defense counsel was not ineffective for failing to attempt to impeach Love by omission;

3. Clay was not prejudiced by counsel's failure to move to strike testimony regarding the firebomb attempt;

4. Clay was not prejudiced by counsel's failure to object to the prosecutor's closing arguments; and

5. Because Clay was not prejudiced by any of this conduct, there was no cumulative error.

*Id*. at 220-28.

The only issue raised by Clay in his PLA was the issue related to the admission of his prior murder conviction. (Answer Ex. E.) As stated above, the Illinois Supreme Court denied Clay's PLA on May 29, 2008. *People v. Clay*, 889 N.E.2d 1118 (2008).

Clay did not file a collateral attack in state court challenging his second conviction, nor did he file a petition for writ of certiorari.

### III. Clay's Section 2254 Habeas Corpus Petition

Clay filed a petition for habeas corpus relief in this court pursuant to 28 U.S.C. § 2254. His habeas petition includes three counts, as set forth below:

1. Trial counsel was ineffective for the same five reasons as were argued on appeal, including:

5

  a. Characterizing Clay in opening statement as a "gang banger" who had committed several unrelated felonies and worked for "the Italians" involved in organized crime;

  b. Failing to utilize prior testimony to impeach a key witness (Frank Love);

  c. Eliciting inflammatory testimony that Clay's family tried to firebomb Frank Love's house right before trial;

  d. Not moving to strike prejudicial testimony that was volunteered on cross-examination; and

  e. Failing to object to prosecutorial misconduct in closing argument.

2. The state relied on perjured testimony, as Frank Love was permitted, at both trials, to deny that prosecutors promised him anything in exchange for his testimony.

3. Clay's due process rights were violated at the state post-conviction proceeding following his first conviction, when the state allegedly conceded error to avoid undergoing discovery that would have revealed that the state knowingly used perjured testimony of Frank Love.

## LEGAL STANDARD

Federal courts may issue a writ of habeas corpus if a petitioner demonstrates that he is "in [state] custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a); *Moffat v. Gilmore*, 113 F.3d 698, 702 (7th Cir. 1997). In order for the federal courts to grant habeas relief, the state court's judgment must be deemed to have "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As such, federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law. *Vecchio v. Ill. Dep't. of Corr.*, 31 F.3d 1363, 1370 (7th Cir. 1994) (en banc).

Before a federal court may review the merits of a habeas petition, the petitioner must exhaust state court remedies by presenting his claims to the state court. 28 U.S.C. §2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, the petitioner is required to provide state courts with a meaningful opportunity to "pass upon the substance of the claims later presented in federal court." *Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001). A meaningful opportunity means that a petitioner "must invoke one complete round of the State's established appellate review process" to resolve any constitutional issues. *O'Sullivan*, 526 U.S. at 845. The rule in Illinois is that "one full round" is completed once the petitioner has presented the habeas claims at each stage of the appellate process, up through the Illinois Supreme Court. *See id.* at 847-48; *see also White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999). A petitioner's failure to exhaust this entire process of state remedies constitutes a procedural default. *See Chambers*, 264 F.3d at 737.

A claim is procedurally defaulted under two circumstances: "(1) that claim was presented to the state courts and the state court ruling against the petitioner rests on adequate and independent state law procedural grounds, or (2) the claim was not presented to the state courts and it is clear that those courts would now hold the claim procedurally barred." *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004).

However, procedural default based upon claims not presented to the state courts is excused in two circumstances. First, procedural default will not bar a federal court from granting habeas relief if "the petitioner demonstrates cause for the default and prejudice resulting therefrom." *Perruquet*, 390 F.3d at 515. Second, procedural default is overturned when the petitioner can show a miscarriage of justice would result if his claims were not heard on the merits. *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

**DISCUSSION**

We must determine whether the claims are procedurally defaulted, and if so, whether such procedural default is excused. The analyses for the three counts in Clay's petition share many similarities, so we address all of the claims at each stage.

**I.      Procedural Default**

As stated above, a claim is procedurally defaulted if (1) the claim was not presented to the state courts, and (2) it is clear that those courts would now hold the claim procedurally barred, the claim is procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004). All of the counts in Clay's petition are procedurally defaulted.

First, Clay failed to comply with the Illinois rule that the petitioner must present habeas claims at each stage of the appellate process, up through the Illinois Supreme Court. With respect to Count One, ineffective assistance of counsel on five specific grounds, Clay brought these arguments to the Illinois Appellate Court, but he did not present them to the Illinois Supreme Court. With respect to Counts Two and Three, regarding the allegedly perjured testimony of Frank Love, Clay failed to raise either of those arguments to either the state appellate court or the state supreme court. In an apparent attempt to resist a finding of procedural default, Petitioner states, "[T]he knowing use of perjured testimony claim was presented to the [2004] state court in a collateral proceeding. Comity was served." (Pet'r Clay's Resp. in Opp'n to Resp't's Answer/Mot. to Dismiss at 6.) Despite the reach for the general notion of "comity," the fact remains that the claims regarding perjured testimony were not raised at any level in state court following the 2005 conviction and sentencing which Petitioner is currently challenging.

Second, it is clear that the Illinois courts would now hold the claims procedurally barred. Under Illinois law, "[i]f a petition for certiorari is not filed, no [post-conviction hearings] shall be commenced more than 6 months from the date for filing a certiorari petition, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c). The deadline for filing a certiorari petition in this case would have been August 27, 2008, 90 days from the entry of the order denying Clay's PLA. Sup. Ct. R. 13. Therefore, Clay had until February 27, 2009 to file a collateral attack in state court. He did not file any collateral attack. Nor has he alleged any facts showing that missing that deadline was due to anything other than his own negligence. As such, Illinois courts would clearly conclude that all three counts would be procedurally barred.

## II.     Excuse of Procedural Default

Next, we must consider whether Clay's claims fall into one of the two categories in which procedural default is excused: either (1) the "cause" and "prejudice" exception, or (2) the miscarriage of justice exception.

### A.     "Cause" and "Prejudice"

As discussed earlier, a federal court may address the merits of a procedurally defaulted claim only if the petitioner can establish cause and prejudice. *Dretke v. Haley*, 541 U.S. 386, 388 (2004).

#### 1.     Cause

In order to establish "cause," the petitioner must show that some external objective factor prevented compliance with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

### a. Banks v. Dretke

In arguing that he has demonstrated "cause" for the procedural default, Clay relies heavily on *Banks v. Dretke*, 540 U.S. 668 (2004). However, this reliance is misplaced. It is true that the facts of the instant case share many similarities with the facts in *Banks*, but there is one key difference that Petitioner fails to note. Banks actually presented the issues raised in his federal habeas petition in the state court. *Id*. at 690. ("Banks alleged in his January 1992 state-court application for a write of habeas corpus that the prosecution knowingly failed to turn over exculpatory evidence involving [the witness] in violation of Bank's due process rights. Banks thus satisfied the exhaustion requirement . . . ." (internal citations omitted)). The *Banks* opinion dealt with the question of whether the petitioner would be entitled to an evidentiary hearing in federal court when he had failed to *develop the facts* of his claim in state court proceedings, not when the he had failed to *raise the claim* altogether. *Id*. at 690-91. Therefore, *Banks* is not directly applicable to the instant situation.

### b. Ineffective Assistance for Failure to Preserve Arguments as "Cause" for Petitioner's Primary Claims

Aside from the reliance on *Banks*, Clay argues that the "cause" of the procedural default for all three claims was ineffective assistance of counsel. Petitioner asserts that his lawyers were ineffective by failing to preserve all of Clay's arguments at all stages of Illinois court.

The Supreme Court has explained that "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim," and "the principles of comity and federalism that underlie our longstanding exhaustion doctrine . . . require *that* constitutional claim, like others, to be first raised in state court." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (emphasis in original). Consequently, "'a claim of ineffective assistance' . . . generally must 'be presented to the state courts as an

independent claim before it may be used to establish cause for a procedural default.'" *Id*. at 451-52 (quoting *Murray v. Carrier*, 477 U.S. 478, 489 (1986)).

Notably, failure to preserve arguments in state court proceedings was not explicitly included as one of the grounds for the "ineffective assistance of counsel" claim laid out in Count One of Clay's federal habeas petition. Nevertheless, we must do a separate analysis of this independent claim for ineffective assistance for failure to preserve arguments ("failure to preserve" claim) to determine if this claim is procedurally defaulted, and if so, whether or not the default may be excused. This analysis tells us whether the "failure to preserve" claim may constitute "cause" for Clay's three primary claims in his petition.

Is the "failure to preserve" claim procedurally defaulted? The answer to this question is "yes," for the same reasons that Petitioner's primary claims are procedurally defaulted. This specific claim was not presented at *any* level of state court. While Clay's direct appeal to the Appellate Court of Illinois included a claim for ineffective assistance of counsel, the issue of "failure to preserve" was never raised as a basis for that claim. Furthermore, Illinois courts would now conclude that the claim was procedurally barred, as we are significantly past the February 27, 2009 deadline for filing a collateral attack in state court.

Next, we look to whether procedural default for this "failure to preserve" claim is excused under either the "cause and prejudice" exception, or the "miscarriage of justice" exception.

Has Petitioner demonstrated "cause" and "prejudice" to excuse the procedural default of this claim? As stated earlier, in order to establish "cause," the petitioner must show that some external objective factor prevented compliance with the state's procedural rule. *Murray*, 477 U.S. at 488. Petitioner offers no explanation as to why this independent claim for ineffective

11

assistance of counsel was not raised at any level of state court, so no "cause" has been shown. With respect to the second prong of this test, "prejudice" refers to the likelihood that the error put Petitioner at an "actual and substantial disadvantage." *Murray*, 477 U.S. at 488. Given that Petitioner failed to establish "cause" with respect to this independent claim, the "prejudice" inquiry is irrelevant. However, as discussed in more detail later, no prejudice stemmed from counsel's failure to preserve argument. Even if the "failure to preserve" claim was excused from being procedurally defaulted, and therefore constituted "cause" for the three primary claims, the "prejudice" requirement is not met for the three primary claims, so those primary claims would still be procedurally defaulted, regardless of whether this second level "failure to preserve" claim constitutes "cause."

Has Petitioner demonstrated that the "miscarriage of justice" exception applies to excuse procedural default for the "failure to preserve" claim? A petitioner's procedural default may be excused even if he fails to satisfy the cause and prejudice exception if "petitioner can demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." *Carpenter*, 529 U.S. at 451. The "miscarriage of justice" analysis is covered in more detail later in this memorandum with respect to the three primary claims, but for now it is sufficient to state that the exception does not apply with respect to the secondary "failure to preserve" claim. As mentioned above, even if we determined that we could review Clay's "failure to preserve" claim, the three primary claims attacking his sentence would still be procedurally defaulted, for the reasons explained above and below. Therefore, refusing to address the "failure to preserve" claim would not result in any miscarriage of justice, as it would have no affect on the overall outcome of Clay's petition.

Since the "failure to preserve" claim is procedurally defaulted, and neither the "cause and prejudice" exception nor the "miscarriage of justice" exception serve to excuse that procedural default, the "failure to preserve" claim cannot serve as "cause" to excuse procedural default of the three primary claims in Clay's petition.

### 2. Prejudice

Now we return to our discussion of Clay's three primary claims in his petition, and whether or not Clay has established "prejudice" as part of the "cause and prejudice" test. Since there has been no showing of "cause" for these three claims, a lengthy examination into this second prong of the test is not required. Nevertheless, we briefly address this issue.

As noted above, "prejudice" refers to the likelihood that the error put Petitioner at an "actual and substantial disadvantage." *Murray*, 477 U.S. at 488. In order to constitute "prejudice" under this rule, the petitioner must show errors that not merely created a *possibility* of prejudice, but that created *actual* prejudice." *Murray*, 477 U.S. at 494.

With respect to Count One, Clay's claim of ineffective assistance of counsel on five grounds, no prejudice has been established. The allegations about purported errors by counsel do not in any way undermine the crux of Clay's conviction. The Appellate Court of Illinois reviewed each of the five grounds in detail, and determined that none of them prejudiced defendant. *People v. Clay*, 884 N.E.2d 214, 222-228 (2008). This was primarily based on the fact that the evidence against Clay was "overwhelming." *Id*. at 223-24, 226. As the Appellate Court explained,

> Agent Jennings and Detective Katalinic both testified defendant confessed his involvement in the 1975 triple murder while in prison for unrelated armed robbery charges. Frank Scott identified defendant in court and in a lineup as one of the men he saw in the alley behind Dr. Gluckman's clinic on the day of the kidnapping. An accomplice, Love, testified about defendant's role in the crimes. While defendant testified he lied to Agent Jennings and Detective Katalinic

13

> regarding his involvement in the murders and simply relayed information he had overheard from Love, Detective Katalinic testified defendant gave specific details regarding the murders that he was not able to get from anyone else who was questioned, including Love.

*Id*. at 223-24. We agree with the Appellate Court's finding that no prejudice resulted from counsel's alleged errors at trial. Two separate juries concluded on two separate occasions that Clay was guilty of these charges beyond a reasonable doubt, and Petitioner has failed to persuade this Court that the result would have been any different if these alleged "errors" had not occurred.

With respect to Count Two, no prejudice has been established. Clay claimed that the state relied on perjured testimony, as Frank Love was permitted, at both trials, to deny that prosecutors promised him anything in exchange for his testimony. Even if what Petitioner asserts is true, and Love "made a deal" involving a "promise of a letter recommending [Love's] parole" (Pet. at 12), Petitioner has not shown that withholding this information from the jury resulted in prejudice. Even assuming that this information would have caused the jury to discredit Love's testimony, the remaining evidence against Clay was still "overwhelming," as explained above.

Finally, with respect to Count Three, no prejudice has been established. Clay claimed that his due process rights were violated at the state post-conviction proceeding following his first conviction when the state allegedly conceded error to avoid undergoing discovery that would have revealed that the state knowingly used perjured testimony of Frank Love. Even if a post-conviction hearing would have resulted in the production of evidence showing a "deal" between the State and Frank Love, Petitioner has not shown that that absence of this information put him at a "substantial" disadvantage. Once again, we note that the evidence against him was "overwhelming," and even if Love's entire testimony had been stricken, there still would have been significant evidence supporting Clay's conviction.

### B. Miscarriage of Justice

A petitioner's procedural default may be excused even if he fails to satisfy the cause and prejudice exception if "petitioner can demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." *Carpenter*, 529 U.S. at 451. This miscarriage of justice exception is limited to the extraordinary circumstances in which the petitioner is innocent of the crime for which he is imprisoned. *Bell v. Plerson*, 267 F.3d 544, 551 (7th Cir. 2001). In order for the miscarriage of justice exception to apply, the petitioner must "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

We note that nowhere in Clay's petition or his response/reply memorandum does Clay assert his innocence. He challenges his incarceration based on what he views as procedural flaws in his prior legal proceedings, but his actual guilt or innocence is not the focal point of his argument.

Furthermore, even if Clay's counsel never committed any of the supposed errors, and Love's testimony was either withheld or impeached with evidence of a "deal," the remaining evidence against Clay is so overwhelming that it is nearly certain a reasonable jury would have convicted him. As stated earlier, the jury was presented with lineup identification by Frank Scott, and testimony by Agent Jennings and Detective Katalinic that Clay confessed to the crime, including detailed information about the crime that had not been obtained from anyone else who had been questioned. Two juries concluded that there was no reasonable doubt regarding Clay's guilt in this matter, and Clay has shown nothing to this Court that would cause us to disagree with the juries' conclusion.

Finally, it is worth noting that, despite the fact that Clay failed to present all of his current claims at each stage of litigation, the case has been presented in various courts, and no court has questioned the validity of Clay's conviction. In 1988, a jury found Clay guilty of these murders. In 1996, Clay filed a complaint in federal court against various defendants for violating his constitutional rights, but the complaint was dismissed for failure to state a claim upon which relief could be granted, and the Seventh Circuit affirmed the dismissal. (Pet. at 4.) In 2005, Clay had a second jury trial, and this second jury also found Clay guilty of the three murders. In 2008, the Appellate Court of Illinois carefully considered each of Clay's arguments on appeal, and concluded that his conviction should stand, in light of the overwhelming evidence against him. There would be no miscarriage of justice if this Court failed to conduct yet another review of Petitioner's case.

## CONCLUSION

For the foregoing reasons, the claims asserted in Roosevelt Clay's petition for writ of habeas corpus are procedurally defaulted, and neither the cause and prejudice exception nor the miscarriage of justice exception serve to excuse the procedural default. Consequently, this Court may not review the merits of the habeas petition. Therefore, Clay's petition for writ of habeas corpus [1] is denied, and this case is hereby terminated. This is a final and appealable order.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: February 4, 2010